IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
On Briefs September 20, 2007

## SERENA RUCKER v. ST. THOMAS HOSPITAL

**A Direct Appeal from the Circuit Court for Davidson County**
**No. 05C-3817      The Honorable Barbara N. Haynes, Judge**

**No. M2007-00716-COA-R3-CV - Filed November 26, 2007**

This is a common-law retaliatory discharge case. Plaintiff/Appellant alleged that she was wrongfully discharged from her employment with Defendant/Appellee. Defendant/Appellee moved for summary judgment, which the trial court granted. Plaintiff/Appellant appeals. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Trial Court Affirmed**

W. FRANK CRAWFORD, J.,delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S. and DAVID R. FARMER, J., joined.

James L. Harris of Nashville, Tennessee for Appellant, Serena Rucker

Luther Wright, Jr. and Martha L. Boyd of Nashville, Tennessee for Appellee, St. Thomas Hospital

**OPINION**

Serena Rucker ("Appellant") began working at St. Thomas Medical Center ("Hospital," or "Appellee") as an oncology nurse in 1987. The record indicates that Ms. Rucker performed well as a nurse. Her evaluations were good, and she was recognized for her achievements in nursing in 2004. In early 2004, the Hospital offered Ms. Rucker the newly-created position of Patient Relations Coordinator ("PRC") in the Hospital's Risk Management Department. Ms. Rucker accepted the position. The Risk Management Department was led by Dr. Clarence Thomas, Jr., and Ms Rucker's direct supervisor was Patient Safety Officer Ava Dean Lancaster.

Ms. Rucker's role as a PRC was to act as a first responder to patient or family complaints. Upon receiving a complaint, Ms. Rucker was to assess the complaint to determine which Hospital employee(s) could best address the complaint. Ideally, Ms. Rucker would ensure that responsibility for the complaint would stay in the unit from which it arose, to be resolved by the unit manager. According to their respective depositions, Ms. Lancaster and Dr. Thomas made it clear to Ms. Rucker that her role was not to solve the problems herself, but rather to mentor unit managers in

order to enable these managers to solve the problems themselves. However, if the complaint had risk management implication, Ms. Rucker was to go directly to Ms. Lancaster.

The record indicates that, almost from the beginning, Ms. Lancaster and Dr. Thomas were unhappy with Ms. Rucker's job performance. In her deposition, Ms. Lancaster recalled an incident in which a patient's family asked Ms. Lancaster not to allow Ms. Rucker back into the patient's room because of their perception that Ms. Rucker was trying to get the patient discharged before the patient was ready. In response to this complaint, Ms. Lancaster states that she ordered Ms. Rucker to stay out of this patient's room. Ms. Rucker defied Ms. Lancaster's instructions and re-entered the room. When asked why she had disobeyed a directive from her supervisor, Ms. Rucker claimed that "this was a complaint about me," which Ms. Rucker felt she need to address.

On September 17, 2004, Ms. Lancaster and Dr. Thomas sat down with Ms. Rucker to discuss her performance in the PRC position. Ms. Lancaster and Dr. Thomas memorialized the substance of this meeting in a document entitled "17 September 2004 Summary of Discussion on Setting Goals" ("2004 Summary"). The 2004 Summary sets forth four specific tasks on which Ms. Rucker was to focus going forward–mentoring managers, performance improvement, visitation of patients who are without complaints, and aggregation of complaint and compliment data. With respect to the first task, mentoring managers, Ms. Lancaster and Dr. Thomas instructed Ms. Rucker that, "[i]f there are problems with our patient and customers, the individuals who should be seen as being most adept at addressing these issues and most involved should be the individuals responsible for care in that area. With that premise problems should be addressed firstly to the managers, working with them to solve the issues." Ms. Lancaster and Dr. Thomas emphasized Ms. Rucker's role as a mentor, rather than a hands-on problem solver, noting, in the 2004 Summary, that "the process of improving the skills of a manager will require interpersonal skills on the part of [Ms. Rucker] to assure that the interchange is a learning experience for both [Ms. Rucker] and the manager."

The second task, performance improvement, was based upon the fact that many problems that patients experience are not a result of individual failings, but rather are the result of failures in the system as a whole. With this in mind, Dr. Thomas and Ms. Lancaster reminded Ms. Rucker to be mindful of this fact, and to look for ways to improve the Hospital processes in order to minimize patient problems.

Concerning the third task, visitation of patients who are without complaint, Ms. Lancaster and Dr. Thomas reminded Ms. Rucker that she was to solicit patients who had not lodged complaints to see if they had any complaints or compliments. Ms. Rucker was directed to take notes and to aggregate her thoughts over time so that the Hospital could take action to address issues that arose repeatedly in particular units.

Finally, Ms. Lancaster and Dr. Thomas instructed Ms. Rucker to focus on aggregation of complaint and compliment data into the Hospital's already-existing database. They noted in the 2004 Summary that Ms. Rucker had not been putting information into the database.

Ms. Lancaster and Dr. Thomas included two other "points of discussion" in the 2004 Summary, to wit:

If there is any potential for a complaint to escalate to a legal claim, [Ms. Lancaster] needs to be informed and have the opportunity to be the individual who will intervene.

Following up of events is important. It is not [Ms. Rucker's] role to do formal investigation of an error or problem that would have implications from either a legal point of view or from a root cause analysis aspect.

In May 2005, Ms. Rucker received her first performance appraisal in the PRC position. The Hospital evaluates employees on a one to three scale. A one means that the employee "inconsistently meets standard;" two means that the employee "successfully meets standard;" and three means the employee "consistently exceeds standard." In her evaluation, Ms. Rucker received an overall performance rating of 60.6 points, comprised of two "3s," seventeen "2s," and nine "1s". Several of the criticisms of Ms. Rucker's work were based upon her failure to improve her performance of the tasks outlined in the 2004 Summary, to wit:

One of the crucial goals set for [Ms. Rucker] on September 17, 2004 was to visit patients on one unit each day to solicit input on their care and offer assistance with any problems they had encountered. This specific goal was set in hopes these visits would prevent issues from becoming complaints. [Ms. Rucker] has been unable to make these visits as required by the agreement she signed and relies primarily on the Volunteer Visitors to see patients who are without complaints. She spends an inordinate amount of time on complaints and doesn't seem able to refer the initial complaint to the Department or Unit Manager. Therefore, the goal of mentoring managers and clinical leaders has not been met. She also continues to insert herself in nursing issues that are no longer her purview since she does not represent a unit or serve as a bedside caregiver. Additionally, some of her peers have voiced distrust of her and consider her efforts in their areas of expertise and responsibilities intrusive and unnecessary. We have seen no data at all from unsolicited visits.

This performance appraisal also notes that Ms. Rucker had failed to maintain a computer database of the complaints she had investigated. As a result, the Hospital had no aggregate data to review for trends and patterns so as to improve its processes. The performance appraisal also notes an incident where Ms. Rucker had helped herself to food that was put out for the residents' lunch. The Hospital holds a noon conference for its medical residents and serves them lunch. When there is leftover food, other employees are welcome to help themselves. However, according to the appraisal, Ms. Lancaster received a call from the secretary of the department of medicine informing her that Ms. Rucker had gone in to eat before the residents arrived. Ms. Lancaster spoke with Ms. Rucker about this incident. In turn. Ms. Rucker went to see the Chief of Medicine and the Chief Resident to discuss the issue with them. When the Chief of Medicine told Ms. Lancaster about this conversation, Ms. Lancaster called Ms. Rucker in to ask why she had gone to the Chief of Medicine

with this issue. Ms. Rucker explained that "it became a complaint about me." Ms. Lancaster also raised the issue of Ms. Rucker's actions following news of the possible elimination of her position, and noted that Ms. Rucker's demeanor toward Dr. Thomas during this incident was insubordinate and disrespectful.[1]

In the performance review, Dr. Thomas and Ms. Lancaster also indicate that Ms. Rucker's job is in jeopardy, to wit:

> [Ms. Rucker] has not adhered to the Patient Relations Coordinator job description. She frequently oversteps the boundaries of her role and assumes positions that are not hers to assume. She has interfered in several patient issues and disregarded specific directives from me. With all this in mind, [Ms. Rucker] will be given 30 days to improve her performance or further steps will be taken.

During the discussion of Ms. Rucker's appraisal with Ms. Lancaster, Dr. Thomas entered the room and asked Ms. Rucker if she would enter into an Individual Improvement Plan. Ms. Rucker acquiesced, and Ms. Lancaster drafted the Improvement Plan that day. The Plan outlined three specific areas that needed to improve and the specific tasks that Ms. Rucker needed to complete in order to improve those areas. In her deposition, Ms. Rucker states that she was "devastated" by Ms. Lancaster's remarks and criticisms. She claims that, although she understood that Ms. Lancaster was dissatisfied with her performance, she did not understand why. A few days later, Ms. Rucker submitted a response to her appraisal. In this response, Ms. Rucker indicates that she viewed Ms. Lancaster's statements as "statements about my character and your perception of me as a person." Ms. Rucker indicated that she disagreed with Ms. Lancaster and Dr. Thomas' criticisms, and that she viewed herself as an effective and highly regarded employee.

In July 2005, Ms. Rucker was again cited for overstepping the bounds of the PRC position. According to Ms. Rucker's deposition, she was approached by Lisa Davis, a Hospital employee. Ms. Davis had enrolled her son (who had recently been diagnosed with diabetes) in the Hospital's employee daycare center. Because the workers in the center were not qualified to administer insulin, Ms. Davis had been informed that the daycare could no longer care for her son. Upon hearing Ms. Davis' story, Ms. Rucker suggested that Ms. Davis talk to the Hospital's Chief Operating Officer, Cindy Wedel. Ms. Rucker went so far as to take Ms. Davis to Ms. Wedel's office so that she could

---

[1] In August 2004, the Hospital underwent a reduction in force, and the Risk Management Department was instructed to select one position for elimination. Dr. Thomas chose the PRC position. Upon learning that her position was being eliminated, Ms. Rucker sent a letter to the Hospital's Chief Executive Officer explaining how she felt about her position and her impending layoff. The next day, the CEO called Dr. Thomas and instructed him to offer Ms. Rucker back her job. In his deposition, Dr. Thomas admits that he was angered by the way this incident was handled. Dr. Thomas initially told Ms. Rucker that, if her position was not eliminated, then someone else's would have to be, which is what he believed at the time. In response, Ms. Rucker told Dr. Thomas that she did not feel it was her problem if someone had to go, but rather that it was Dr. Thomas' problem. Dr. Thomas states that he was surprised by what he perceived as an inordinately harsh response by Ms. Rucker. The decision was ultimately made that the Risk Management Department would not have to eliminate any positions.

make an appointment. Ms. Rucker testified that she told Ms. Davis to "[g]o right in that office. You tell her [Ms. Wedel's secretary] that you'd like to talk to Cindy because Cindy always has an open-door policy...." According to Ms. Rucker, she left Ms. Davis with Ms. Wedel's secretary to make an appointment. Ms. Rucker further explained that it was normal for Hospital employees to seek her out for help because she was "all over the hospital and as patient relations coordinator and as president of the nursing staff and having been involved in shared governance for many, many years," and that "[a]ny way [she] could guide anyone to where they needed to be to have issues taken care of, [she] would do so."

Ms. Lancaster and Dr. Thomas were not pleased with Ms. Rucker's involvement in Ms. Davis' matter. According to Ms. Lancaster, Ms. Davis' issue was essentially a Human Resources matter, not one that need to be brought directly to the COO. According to Ms. Lancaster, Ms. Rucker had no responsibility for human resources issues. In a written statement to Ms. Rucker, Ms. Lancaster and Dr. Thomas stated that Ms. Rucker "is on notice that any further deviation from her job description and activities previously included in an Individual Improvement Plan will result in her termination of employment at St. Thomas Hospital."

Approximately three months after this event, Ms. Rucker was removed from her PRC position for allegedly using poor judgment during an incident involving an allegedly impaired nurse. This is also the event that Ms. Rucker alleges forms the basis for her whistleblower claim. According to Ms. Rucker, she was paged by a staff member to the Hospital's critical care unit to talk to a patient's family members. Ms. Rucker met with the patient's wife and sister. According to Ms. Rucker, the patient's wife informed her that one of the unit nurses (who had been caring for the patient during the morning shift) had returned from lunch acting strangely, and in a manner that led the patient's wife to think the nurse was impaired. The charge nurse had informed the patient's wife that she was aware of the situation, and that she (not the allegedly impaired nurse) would be caring for the patient for the remainder of the shift. However, the allegedly impaired nurse had continued to enter the patient's room.

Ms. Rucker's own e-mail description of the incident reveals that she recognized the situation as one that could give rise to serious risk management implications, to wit: "Given the extremely sensitive nature of this situation, it had Risk Management written all over it, in my estimation, and that this was definitely a matter for the Critical Care Director and his Clinical Leaders to address, NOT me...." Nevertheless, Ms. Rucker did not call Ms. Lancaster, as she had been instructed to do in these situation. Rather, Ms. Rucker went to the patient's room, with his wife, and addressed the situation directly with the charge nurse. Ms. Rucker then went to find the Clinical Leader, Saramma George. Ms. George chastised Ms. Rucker for bringing the patient's wife back into the unit during non-visiting hours, and called the Critical Care Director, Marco Fernandez. Ms. Rucker explained to Ms. George that, as the first responder to a family members' complaint, she was the wife's "advocate." Eventually, Janet Cornett, a supervisor, was notified, and Ms. Cornett escorted the allegedly impaired nurse off the unit. Ms. Rucker testifies that she then spent approximately three hours with the patient's wife, trying to assure her until she felt safe. Ms. Lancaster was never called during this incident.

The following day, Ms. Lancaster learned of the incident from employees of the critical care unit. Ms. Lancaster then initiated an investigation, and asked Ms. Rucker to draft a statement of her version of the events. In this statement, Ms. Rucker described her version of the events, and added that she was hurt by the "witch hunt and an attack on my character and intentions developed into a complaint against me for wrong-doing." Ms. Rucker stated that, had she known the event would escalate, she "would certainly have called [Ms. Lancaster] without hesitation." Concerning what she would have done differently, Ms. Rucker stated that "I haven't come up with them [i.e. ideas about how she would have acted differently in the situation] other than as [Ms. Lancaster] states, I should have called her first."

Ms. Lancaster asserts that Ms. Rucker botched the handling of the situation in two significant ways. First, she neglected to call Ms. Lancaster so that risk management could get involved. Second, she failed to attempt to restore the wife's faith that the mangers of the critical care unit were taking care of the situation. Upon concluding their investigation, Ms. Lancaster and the Human Resources representative, Teresa Daniel, met with Ms. Rucker to review their findings and conclusions. These findings and conclusions are memorialized in an "Associate Conference Report" dated November 3, 2005. In this Report, Ms. Lancaster expresses her concern that Ms. Rucker had again failed to assess a situation correctly, despite the fact that Ms. Rucker recognized the risk management implications. Ms. Lancaster also noted that Ms. Rucker admitted that she should have called Ms. Lancaster. Ms. Lancaster concluded that Ms. Rucker's inability to follow instructions, and her failure to function within the scope of her responsibilities, rendered Ms. Rucker ineffective in the PRC position. Accordingly, Ms. Lancaster removed Ms. Rucker from the PRC position. However, Ms. Rucker's employment with the Hospital was not terminated. Rather, the Hospital indicated that it would continue to pay her salary for thirty days, thereby giving Ms. Rucker the opportunity to secure another job within the Hospital.

Ms. Rucker wrote a response to the Report, wherein she stated that the "unfair treatment and false allegations" made by Ms. Lancaster and Dr. Thomas were "based solely on a personal vendetta." Ms. Rucker vowed to "continue to fight for justice, equality and my right to be heard." In her response, Ms. Rucker makes no mention of the whistleblower claim she raises in her Complaint–that she was fired for reporting an impaired nurse. When asked, at her deposition, why she was fired, Ms. Rucker stated, in relevant part:

> Q. Why do you think you were removed from the patient relations coordinator position?
>
> A. Well, I don't think it had anything to do with that nurse in the pods. I think that was yet another opportunity to harass me in my role, as was the situation with [Ms. Davis and her son's daycare], as was the narrative part of my performance appraisal accusing me of stealing food from noon conference. Golly, I don't know. There's nothing I want to know more than to know why I'm not doing that job today.

-6-

Following her removal from the PRC position, Ms. Rucker began looking for another job with the Hospital. She made inquiries into four positions. Although she was offered a job as a staff nurse in oncology and planned to accept the position, she ultimately declined the job because it paid less that the PRC position. Because Ms. Rucker had not procured a new position within the thirty days, her employment with the Hospital ended in December 2005. Ms. Rucker did not work from December 2005 until June 2006, when she accepted a $62,000 per year job with the Vanderbilt Institute for Clinical and Translational Research.

On December 15, 2005, Ms. Rucker filed suit against the Hospital, alleging both a violation of the Tennessee Public Protection Act (T.C.A. § 50-1-304) and common-law retaliatory discharge. Specifically, Ms. Rucker asserts that her employment was terminated in retaliation for reporting that a nurse was impaired. On February 2, 2006, the Hospital answered and denied all liability. On January 15, 2007, the Hospital filed a motion for summary judgment. Ms. Rucker did not contest the Hospital's motion with respect to the statutory claims. Thus, the only claim in contention was her common-law claim.

On March 5, 2007, the trial court entered an order granting the Hospital's motion for summary judgment as to both of Ms. Rucker's claims. Ms. Rucker appeals and raises one issue for review as stated in her brief: "Did the trial judge err in concluding that there existed no genuine issues of material fact as to the plaintiff's common-law claim for retaliatory discharge?"

It is well settled that motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The moving party for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997). On a motion for summary judgment, the court must take the strongest legitimate view of evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn.1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery material, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth specific facts showing that there is a genuine issue of material fact for trial.*Id*. at 210-11 (citations omitted).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995). Because only questions of law are involved, there is no presumption of correctness regarding a trial court's grant or denial of summary judgment. *See Bain*, 926 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn.1997).

To prevail on a claim of common law retaliatory discharge, an employee must prove: (1) that an at-will employment relationship existed between the employee and the employer, (2) that the employee was discharged, (3) that the employee was discharged for attempting to exercise a statutory or constitutional right, or for any other reason that violates a clear public policy, and (4) that such action was a substantial factor in the employer's decision to discharge the employee. *See Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d at 535; *see also Anderson v. Standard Register Co.*, 857 S.W.2d 555, 557-58 (Tenn.1993).

The material facts in this case are undisputed and documented in the record. On appeal, Ms. Rucker asserts that the issues in this case hinge upon witness credibility, as they involve motive, intent, and/or perception. Accordingly, she asserts that this case is not ripe for summary judgment. *See, e.g.*, *Knapp v. Holiday Inns, Inc.*, 682 S.W.2d 936, 941-42 (Tenn. Ct. App. 1984) ("[I]f the opponent to a motion for summary judgment succeeds in raising a genuine doubt concerning a witness' credibility by a sufficient showing of the witness' bias, prejudice, or interest, the summary judgment should be denied, and the case should be decided by the trier of fact."). We disagree with Ms. Rucker's assertion. As set out above, the material facts in this case are documented in writing. Furthermore, there is no allegation or proof that these records are fabricated, or that they otherwise deviate from the actual conversations, which they document. Consequently, the question of witness credibility is not dispositive here. The respective documents are unambiguous, and, therefore, there is no need for a trier of fact.

Turning to the *prima facie* case for common-law retaliatory discharge, Ms. Rucker has proven only criterion one–that there existed an at-will employment relationship. As to the second criterion–that plaintiff was discharged, as set out above, Ms. Rucker's employment was not terminated by the Hospital. Upon removing her from her PRC position, she was given thirty days to procure other employment within the Hospital. The record shows that Ms. Rucker was, in fact, offered a nursing job, but that **she** declined that position because it paid less that the PRC position. Even though this decision ultimately resulted in Ms. Rucker leaving the employment of the Hospital, this consequence flowed directly from Ms. Rucker's decision to decline the offered position–a decision that was hers, alone.

Even if we assume, *arguendo* (which we do not), that Ms. Rucker's employment was terminated by the Hospital, the record does not support a finding that the discharge was retaliatory in nature. There is no evidence in this record that Ms. Rucker ever felt that she could not report the allegedly impaired nurse. In fact, the evidence in record indicates just the opposite–that Ms. Rucker was encouraged to seek out complaints and problems in the Hospital. The subtle fact is that Ms. Rucker failed, not in the fact of the reporting, but in the manner of the reporting. Despite being given unambiguous instructions to bring any matter with risk management implications to the immediate attention of Ms. Lancaster, the record shows that Ms. Rucker ignored this directive. Moreover, Ms. Rucker admits that she should have reported the allegedly impaired nurse situation to Ms. Lancaster. The record shows that this was not the only incident where Ms. Rucker failed to follow proper protocol. As set out above, there were numerous incidents where Ms. Rucker broke the specific chain of command that she was given to follow. Although we concede that Ms. Rucker's motives may have been pure, she simply did not stay within the boundaries of her position, nor did she fulfill the expectations of that job in terms of accumulating data. Consequently, Ms.

Rucker fails to establish the fourth, and final, criterion for common-law retaliatory discharge–that the protected activity was a substantial factor in her discharge from Hospital employment. As set out above, in her deposition, Ms. Rucker states that she does not think her removal from the PRC position had anything to do with the allegedly impaired nurse incident. We agree. Although Ms. Rucker explained that her removal was just one more example of the "harassment" she claims to have experienced, we find no evidence of retaliation in this case. Rather, the record evinces a string of shortcomings, deviations, and overstepping on the part of Ms. Rucker, which were not remedied despite the numerous opportunities given by the Hospital. In short, Ms. Rucker has failed to meet her burden in this case.

For the foregoing reasons, we affirm the Order of the trial court, granting summary judgment in favor of the Hospital. Costs of this appeal are assessed against the Appellant, Serena Rucker, and her surety.

_____
W. FRANK CRAWFORD, JUDGE